[Civ. No. 6474. Fourth Dist. Oct. 3, 1961.]

FROILAN A. NICHOLAS, Respondent, v. HARGER-HALDEMAN (a Corporation), Appellant.

Cameron W. Cecil, R. D. Sweeney and John R. Y. Lindley for Appellant.

Newberry, Prante & Biggins and Stafford W. Prante for Respondent.

GRIFFIN, P. J.—Plaintiff, cross-defendant, cross-complainant and respondent (hereinafter referred to as plaintiff) brought this action against defendant, cross-complainant and appellant Harger-Haldeman (hereinafter referred to as defendant) for conversion of listed personal property consisting of wearing apparel, suitcases, paintings and supplies, a gun, cameras, phonograph and radio, etc., of a claimed value of $4,827.10.

Defendant answered, admitted it repossessed a Chrysler automobile which had formerly been sold under contract to plaintiff and there were contained therein certain listed objects of personal property. However, it alleged that the reasonable value of this personal property was only $250; that this car and its possessions were taken by an independent contractor who had been ordered by defendant to obtain possession of the car for claimed failure of plaintiff to pay $200 due on said car. It claims that when the articles of personal property were found in defendant's repossessed car, defendant offered to return such items as defendant received but plaintiff refused. There is a conflict in the evidence as to the items of personal property received and offered to be returned.

It is then alleged, by way of cross-complaint, based on a conditional sales contract (Exhibit K), that on June 26, 1958, in Los Angeles, defendant delivered to plaintiff a 1958 Chrysler automobile; that on July 7, 1958, plaintiff defaulted in a payment of $200 then due and defendant took possession of the car and thereafter sold it at a private sale for $2,888;

that $166.75 was paid for repossessing and reselling it; that there was a contract balance of $4,183.95 due, and after crediting money from the sale there was due from plaintiff to defendant $1,166.57. Attorney's fees under the contract were claimed by defendant.

In answer thereto, plaintiff denied that on June 26, 1958, he executed the conditional sales contract pleaded. He claims that he was asked to sign and did sign several papers and that he was told by defendant's agents that the instruments he signed would be filled out pursuant to the oral agreement of the parties. He denied there was any balance due on the contract or that he agreed to pay a $200 installment on July 7, 1958, and claims that the car was wrongfully taken from his possession.

As a further argument, it is stated that plaintiff was never given a copy of said conditional sales contract as claimed to have been executed by him and accordingly the transaction was null and void and against public policy as provided in Civil Code, section 2982.

In plaintiff's cross-complaint, it is claimed that agents of defendant falsely and fraudulently represented to him certain facts to induce him to sign the conditional sales contract and that defendant fraudulently filled in a provision for a $200 payment due on July 7, 1958; that plaintiff was told by agents of defendant that he would not have to make such a payment; that after repossession plaintiff demanded that defendant return to him the consideration he paid to them under the contract ($300) as a down payment, plus $107.11 (one monthly payment) and return a Dodge trade-in, but defendant refused. Judgment was sought accordingly and to declare the conditional sales agreement *void* and to have judgment for the value of the personal property taken, including the value of the Chrysler car fixed at $4,052.33. Plaintiff also sought $4,827.10 as being the value of the personal property, loss of time and money expended, plus reasonable attorney's fees and $10,000 in exemplary damages.

Defendant, in answer to plaintiff's cross-complaint, denied generally these allegations and alleged that plaintiff represented to defendant that he had received a copy of the conditional sales agreement at the time; that if he did not receive it, Civil Code, section 2982, was unconstitutional as applied to defendant; that plaintiff had the exclusive use of the car from June 26, 1958, until August 1, 1958, and the value of its use was $10 per day plus a depreciation value of $1,460.86.

After a trial by jury, verdicts were returned to the court signed by the foreman, as follows: Found by special interrogatories that the conditional sales contract was signed at a time when it was completely filled out except for signatures and that an exact copy was delivered to plaintiff at the time of its execution. Then follow verdicts signed by the foreman that defendant converted the Chrysler car and fixed the damages therefor at $760; that defendant converted the personal property and effects of plaintiff and fixed the damage at $2,500; that plaintiff did not breach his contract with defendant; that punitive damages be awarded plaintiff in the sum of $5,000. Judgment on the verdicts was accordingly entered on February 24, 1960. Defendant's motion to set aside and vacate the judgment was denied. Motion for new trial was made by defendant and the court announced that it would be granted unless plaintiff would waive any portion of the judgment for punitive damages in excess of $2,500. Such a waiver was filed. Defendant appealed.

▌ Apparently, for the first time on this appeal, defendant raises the question of the validity of the verdicts as rendered by the jury and the verdicts as recorded by the clerk. The record pertaining to this question is not entirely complete. The reporter's transcript shows that the general verdicts for the plaintiff were received by the court and the clerk was instructed to read them. They were read as above indicated and the jurors were asked if these were their verdicts as read and the jurors replied in the affirmative. The clerk was directed to record the verdicts. The verdicts as read did not include a general verdict for defendant. At this point an exchange of comments took place between the clerk and respective counsel. Apparently the clerk found that he did not have copies of two forms of verdicts, one containing two special interrogatories and the other a form of punitive damages. Defendant's counsel offered the clerk his "yellow copy" of a form of verdict. The reporter's transcript shows that the court reporter typed a form of verdict pertaining to punitive damages. According to plaintiff's brief, the clerk, upon reading of the verdicts as recorded, erroneously read from a copy of the "yellow copy" provided by defendant's counsel. It included a general verdict for defendant. The remaining verdicts were recorded as received. Without noticing the error by respective counsel, the clerk, the jurors, or the judge who was merely receiving the verdict in the absence of and for the accommodation of the trial judge, the jury

was asked if this was its verdict as recorded and the jury so indicated. After recitation of these claimed facts in plaintiff's brief, defendant's counsel neither denied nor admitted these statements and no mention of it was made in his reply brief. Apparently this claimed error in respect to the reading of a recorded verdict for defendant was not discovered or called to the attention of the trial judge at the time nor on the motion for a new trial. It first appears in defendant's opening brief. This court wrote counsel for defendant to try to obtain a stipulation pertaining to the true facts surrounding the reading of the recorded verdicts. Counsel for defendant claimed that he was not the trial attorney and had no knowledge other than what the record indicated in the reporter's transcript. No stipulation was forthcoming. Thereafter, this court ordered the entire files brought up to it and to be made a part of the record on appeal. We have examined the record. It contains no verdict signed by the foreman of the jury indicating that the jury ever returned a general verdict ''in favor of defendant.'' There is contained therein a blank form for such a verdict, unsigned by the foreman and undated. Lines are drawn through the portion of the verdict finding a verdict for defendant. There is no evidence or record showing that such a verdict was ever returned by the jury or signed by the foreman. Defendant now argues that the trial court was not authorized to choose between a general verdict for defendant, as is declared in the recorded verdict, and the verdicts rendered in favor of plaintiff, as first announced. It is contended that this court is now required, under *Estate of Caldwell*, 216 Cal. 694 [16 P.2d 139], to accept the reporter's transcript as the true record on appeal. In view of the entire record here presented, we conclude that an unfortunate clerical error did occur and that the trial judge was authorized to reject any claim that a general verdict was, in fact, returned in favor of defendant. (*Moody* v. *McDonald*, 4 Cal. 297, 299; 4 Cal.Jur.2d § 431, p. 250.) Furthermore, since the point was not presented to the trial judge for his consideration, and was raised for the first time on appeal, the point should not receive further consideration by this court. (*Lynch* v. *Birdwell*, 44 Cal.2d 839, 851 [285 P.2d 919]; 2 Witkin, California Procedure, §§ 96-97, pp. 1824-1826.)

Defendant challenges the special finding of the jury that there was no breach of the contract by plaintiff, claiming the record affirmatively shows that he was in default from July 15, 1958, until the car was repossessed on August 1, 1958.

### Evidence

Plaintiff's testimony shows that plaintiff went to defendant's place of business to look into the possibility of buying a car. Defendant's agent offered plaintiff $600 for his 1951 Dodge trade-in, with $300 cash as down payment on a New Yorker 1957 model. About this time a "special sale" on a new Windsor Chrysler car, priced at $4,100, was pointed out to the plaintiff and the agent told him that there would be a saving of about $900 from the original price if he took that one and that he would give plaintiff $950 allowance on his old car; that on the payment of $300 down he could drive the car off of the lot. The payments were to be a little over $100 per month but the agent claimed he would have to have the approval of the manager of the company and the controller; that in six minutes the agent returned and said the sale was approved; that he and the salesman signed some papers to that effect and a copy was given to plaintiff but plaintiff claims his copy was placed in the car and was among his possessions when the car was repossessed. Plaintiff testified that on June 24 he gave the agent a $20 deposit and also assigned the pink ownership certificate for his Dodge car over to defendant company. The agent told him that $280 of the balance of the down payment must be paid, so that next afternoon plaintiff brought that sum to defendant and produced as evidence at the trial his bank book as evidence of the withdrawal on that date. At that time defendant's agent told plaintiff that the car would not be ready until the next day. Plaintiff then returned and defendant's agent asked plaintiff for the receipt given him for the money and also for his copy of the conditional sales contract signed by them. Plaintiff stated that he had left them at home. Defendant's agent told plaintiff "something happened" and he would have to have another contract drawn up because he would have to have an additional $200 down payment on the car and he would have to have an additional amount for payment of insurance premium; that defendant's agent started to write up a new agreement including $139 more for insurance and the additional $200 payment as indicated. Plaintiff testified that he tried to stop him and said he did not want to sign any more contracts and demanded that his money and the Dodge car be returned to him. Defendant's agent told him he could not do that because the sale was already closed. Plaintiff refused to recognize a new conditional sales agreement. The agent and the controller for the defendant told plaintiff then that the agreement would

be that the additional $200 would be added to the contract by covering it up in the monthly payments. Some new form of paper was drawn and the bookkeeper told plaintiff to sign it and also said that his copy would be sent to him through the mail. Plaintiff testified that these papers he signed were of a different color than the one theretofore signed and that he did not remember whether there was typewriting on them or not; that he had not read them because he did not think there was anything wrong in them. On June 26, the Chrysler car was turned over to plaintiff and defendant kept the Dodge car. About two weeks later, plaintiff received through the mail a copy of an alleged contract containing the $200 additional payment. Originally, defendant's agent told plaintiff that the payments would be due on August 1, 1959, but that he later, through the Better Business Bureau, discovered that the $200 was placed in the second contract as being a payment due on July 7, 1958. He testified that he did not understand what the figures "7-7" on the agreement meant; that on July 28, 1959, he mailed the August monthly payment of $107.11. Defendant admitted receipt of this sum on July 30, 1959.

Plaintiff then testified that he lived at the La Quinta Hotel in Palm Springs at the time of the transaction; that he came to San Diego in his car about July 25 with all of his personal belongings and had not found a permanent place of abode; that he was visiting with his daughter in Chula Vista at the address given on his contract; that at the time of the taking of his car it was locked and plaintiff had the key; that he looked out of the window and saw the car being moved and he gave chase but was unable to stop the driver who was moving very fast; that he called the police and they questioned plaintiff about the payments on the car. Plaintiff told them he had made the first payment thereon and he had not had the car 30 days. He called defendant company in Los Angeles and reported the car stolen. Plaintiff was informed that the car had been repossessed. He told defendant's agent he had just sent in the $107.11 payment due on the car and defendant's agent informed him that the repossession was for the $200 "pickup" payment due on July 7, 1959. Plaintiff said he knew nothing of such a payment supposedly due on July 7; that he then told defendant's agent that he wanted to retain the car and would pay the $200 to secure the return of the car and his personal belongings; that the manager told plaintiff he could send the $200 to him but he could not have

the car returned. At the suggestion of defendant's agent, plaintiff went to Los Angeles by bus and talked to defendant's insurance man who insisted that plaintiff sign a new contract in reference to insurance. Plaintiff refused because he had already signed a contract about it. Defendant's credit manager refused to return the car to plaintiff unless he would then pay, in addition to the $200, $1,000 for the repossession services and the balance due on the car at that time. Plaintiff was unable to do so. Defendant's agent offered to plaintiff the personal belongings in the car, but plaintiff said he could not take them because he had no way to carry them back to San Diego. Plaintiff testified that he begged defendant's agent to let him have the car for the $200 payment so that he could have the car and take back his personal belongings with him. Defendant's agent told plaintiff that he did not have time to argue with him and plaintiff left. At the trial, plaintiff described in detail the articles, and their value, which were in the car when it was repossessed by defendant.

Since the jury found by special verdict that the second conditional sales agreement of June 26 (Exhibit K) was signed by defendant at a time when it was completely filled out and that plaintiff received a copy thereof, all of which is supported by the evidence, the invalidity of the second contract on these grounds cannot be well argued. Other grounds of claimed invalidity of the contract are not well pleaded. It is alleged that on June 26 defendant fraudulently induced plaintiff to sign Exhibit K by falsely representing that the contract would be filled out to conform with their oral agreement and that plaintiff never agreed to pay the $200 installment on July 7, 1958, and that, being of foreign descent and not well-versed in the English language, he believed the contract was filled out according to their oral agreement. In the pretrial statement, plaintiff states that one of the issues to be decided was "whether the conditional sales contract for the sale of the automobile was a valid contract." The court, in its pretrial order, found the issues to be: "A determination and an adjudication of the contractual relation between plaintiff and defendant and the terms and conditions thereof. . . . Whether or not there was a breach of conditional sales contract legally justifying a repossession of the automobile. . . . Whether or not plaintiff was entitled to a rescission of the contract to purchase."

The jury, by special verdict, found that plaintiff did not

breach his contract with defendant and that defendant converted the Chrysler car. This well indicates that the jury believed either that the purchase agreement (Exhibit K) was invalid for some reason established by the evidence, or, if it was valid, there was some form of waiver of the $200 payment due, or that there was no contract existing between the parties and no demand for the return of the car had been made, or that there was a fraudulent misrepresentation by defendant of facts sufficient to constitute fraud on the part of defendant in the execution of Exhibit K or there was a lack of consideration for the execution of it, and therefore the conditional sales agreement was ineffective or invalid. If the determination of the jury was that Exhibit K was invalid, the first written contract comes into play and becomes an important part of the transaction. The provisions of the first written contract were fully testified to by the plaintiff. It was reduced to writing and signed by the parties. Defendant argues that Exhibits A and B were only notes pertaining to the transaction and that some agreement similar to Exhibit K was signed as the original contract of purchase executed on June 24. No such document was produced and none appears in the record before us. Exhibit A, entitled "Sales Order, Confirmation and Sales Agreement," which is in evidence, was executed on June 24, 1958. It provided in general for a trade-in of a Dodge at $950, a deposit credit of $20, an additional payment down of $280, plus insurance premiums showing a balance due of $4,055.96, with a notation, in print, that plaintiff agrees to pay seller "above special pick-up payments and, in addition, 36 equal monthly payments of $107.43, all in accordance with the terms and conditions of your Conditional Sales Contract." Exhibit B has pencil and pen notes under the heading "Special Pick-up Payments: $200 on July 7, 1958." A former date of July 30 appears to have been erased and changed to July 7 as the due date. Above the figure July 7, 1958, appears a circled date (July 15) as the due date. Exhibit B provided that the pickup payments and, in addition, 36 equal monthly payments of $102.59 were to be paid beginning August 2, 1958. The unpaid balance was fixed at $3,162.41. With these notations, it is quite clear that by the contract of June 24, it was not intended that the first contract should contain, nor did it mention anything about a $200 payment, and it was not until June 26, 1958, that these changes were noted thereon. Furthermore, it appears clearly from it that if a new contract was to be drawn on June 26, the

payment of $200 was not to become due until August 2, 1958, and the balance was payable in 36 equal monthly payments of $102.59 or $107.43.

On Exhibit B the insurance charge was $187, with no time sales differential indicated. This contract, Exhibit B, was marked "Void" by someone. There is no indication that plaintiff had a part in marking it. On Exhibit A, which was signed by both parties, the insurance amount had been erased and raised to the sum of $332. A time sales differential of $758.54 had been added. In the space provided for special pick-up payments there has apparently been inserted "$200 on July 7, 1958, no int." Above that appear the words "11 days," and in the agreement to pay such pickup payments it is stated that the payments due on the total sum shall be paid in 36 equal monthly payments of $107.43 beginning August 2, 1958." The balance was changed to $4,055.96. Under the special pick-up payment item there was an ink notation "37 days." Credit was noted on the contract for the $20 and the $280 payments made by plaintiff.

Appellant argues that Exhibit K was the written contract and superseded all other negotiations. In *K. Lundeen Corp.* v. *Barlow,* 120 Cal.App. 391 [7 P.2d 1102], it was stated that the rule, based upon Civil Code, section 1625, that a written contract supersedes all negotiations and stipulations concerning the matter between the parties has no application where there was fraud in the inception of the agreement. It is true that a party signing a contract cannot excuse himself and escape its effects by testifying that he did not have his glasses with him at the time he signed, or that he did not read the contract, in the absence of a showing that he was prevented by the agent from reading the limiting clause or was otherwise tricked into signing the document without reading it, and where he made no request to have the contract read to him. (*Gridley* v. *Tilson,* 202 Cal. 748 [262 P. 322].) If the jury believed that the second contract was invalid, then the question arises did it accordingly find that the contract of June 24, either Exhibit A or B, in their original state, was valid and in force on the day of the repossession. If so, no payments were due thereunder at that time and the finding of the jury that plaintiff did not breach his contract as originally executed can be justified.

In determining the question of fraud and the invalidity of Exhibit K, we must consider some of the background of the entire transaction. Here, defendant was dealing with a

foreigner who had little understanding of the English language and lack of education to read and comprehend the terms of the written agreement he signed. Although it was shown that he did try to act as an insurance agent for an insurance company for a short period several years ago, it appears that he is now a waiter or cook when employed. At times he did portrait work, some of which was of his young daughter who was entered in a beauty contest. As part of the sales talk, defendant's agent told him that if his daughter won the contest it would really be nice for him to have this new Chrysler to take the daughter around in and "show her off." Apparently this inspired plaintiff to sign up to buy the more expensive car. He understood the promises made by the agent as to the price he was to receive for his old car and the payments per month he would be required to make. Exhibit B, as it originally existed and before changes were made therein by defendant's agent, reflects the deal as originally made, according to plaintiff's testimony. It is of interest to note that Exhibit K was different in form from Exhibits A and B. Exhibit K was a printed form on white paper setting forth in bold type on its face certain figures and information. It contains a reference to the printing on the back thereof as being the terms and conditions thereof, one of which, after examination with a magnifying glass, was found to state in effect that acceptance by seller of any payment hereunder after the same is due shall not constitute a waiver of any provisions of the contract. These conditions are printed in very small type, are unreadable to the average naked eye, and the printing is so faded that the page appears, at first glance, to contain no printing at all. Exhibits A and B have bold type readable printing on the reverse side and there is no provision contained therein about any waiver. Defendant relies upon *Pacific Finance etc. Co.* v. *Pierce,* 48 Cal.App. 600 [191 P. 1115], and *Fageol Truck & Coach Co.* v. *Pacific Indemnity Co.*, 18 Cal.2d 748, 756 [117 P.2d 669], as holding that the provisions of Exhibit K were binding on plaintiff.

In the instant action, it affirmatively appears that plaintiff paid over his $300 as the down payment, title passed to defendant for his Dodge car and defendant thereby became obligated to deliver the Chrysler under that agreement. For some undisclosed reason, defendant's agents, on June 26, changed their minds and decided to exact a further down payment of $200, plus added insurance. It was at this point that plaintiff demanded the return of his Dodge and down pay-

ment but defendant refused, stating that it could not be done because plaintiff had already *signed the contract to buy it.* From this evidence, it might well appear that defendant recognized and was relying on Exhibit A or B as being a recognized contract of sale.

Apparently believing that he was forced to sign a new contract to save his down payment and Dodge car, plaintiff signed Exhibit K, the conditional sales contract of June 26. There was no further consideration for the execution of the new agreement. It was all for the benefit of defendant. The basic doctrine generally required by the several states is that a promise to pay an additional or a greater amount than that which the promisee is already under contractual obligation to the promissor to pay is without consideration. (12 A.L.R. 2d § 2, p. 80; *Western Lithograph Co.* v. *Vanomar Producers,* 185 Cal. 366 [197 P. 103].) Although Exhibits A and B are not pleaded as being the contract upon which plaintiff relies, it is pleaded that Exhibit K, the second agreement, pleaded by defendant, was obtained by fraud and was illegal in certain respects. The pretrial statement of plaintiff's counsel and the court's order clearly indicated that one of the issues involved was the validity of the conditional sales contract. Throughout the trial, the validity of Exhibit K was placed in question and evidence was taken on the subject. Furthermore, at defendant's request, the jury was instructed that if it found the conditional sales contract (Exhibit K) was valid, and plaintiff failed to make the $200 payment called for under its terms, defendant might be entitled to a deficiency judgment. In other instructions, the court told the jury, in effect, that it was up to the jury to determine the validity of Exhibit K and if it found Exhibit K was not executed under the conditions required it should determine whether any earlier writing signed by both parties and intended to be the contract was executed by them, and, if so, what were its terms and conditions. If the jury adopted Exhibit A or B as the enforceable contract, plaintiff had, by its terms, until August 2 to meet the required payments. The jury was further instructed that if Exhibit K was valid and there was a payment due thereon when the car was repossessed, it must be determined whether there had been a waiver of the right to strictly enforce the contract, where there had been a delinquency and the seller voluntarily accepted it without obligation.

It therefore appears that the validity of Exhibit K was

in issue at the trial and it was considered by the jury. ▮ It is a general rule that it is error to give instructions which are outside the issues made by the pleadings. ▮ However, issues are not necessarily limited to those presented by the pleadings. A party cannot permit an issue to be litigated and on appeal escape the consequences by claiming that such issue was not pleaded. (*Vaughn* v. *Jonas*, 31 Cal.2d 586 [191 P.2d 432] ; 1 Stanbury, Calif. Trial and Appellate Practice, § 621, pp. 679-680.) ▮ We will therefore assume that the jury did determine Exhibit K invalid and Exhibits A and B as originally executed valid, or that there was a waiver of default. In *Lindsey* v. *Butte*, 96 Cal.App. 465 [274 P. 428, 275 P. 525], it was held that a condition in a contract such as this providing for a forfeiture in case of default must be strictly interpreted against the party for whose benefit it is created; and while the acceptance of past-due installments will not waive the right of forfeiture as to future defaults, the acceptance by the vendor of one of two installments then past due will effect a waiver as to both said defaults, and where no subsequent default occurs the vendor has no right to retake the automobile. ▮ As to the claimed waiver, it does here appear that plaintiff did seek a postponement of the claimed $200 payment due on July 7 and such payment was postponed by defendant's agent until July 15. The agent neglected to indicate that date on his collection card, but did note it on Exhibit A. In the meantime, the collection had been placed in the hands of an agent for repossession of the car and the agent was told by plaintiff on July 9 that he had obtained the postponement and no further action was taken. On July 21, plaintiff wrote defendant that he would not be able to meet the payment of $200 due on July 15 and asked for more time. Apparently plaintiff received no reply to this request. It is true that defendant claims its records indicate a telegram was sent plaintiff on July 15 for an immediate payment of $200, and on July 18 its agent telephoned to someone at the address given in San Diego and was informed plaintiff did not live there. Plaintiff denies ever receiving such a telegram or notice of telephone call. Thereafter, on July 30, plaintiff made a payment of $107.11 and defendant accepted it. Defendant contends that it did not know the whereabouts of the plaintiff, and, after endeavoring to find him, was justified in repossessing the car for default in the payment of the $200. ▮ In respect to

waiver, the defendant offered an instruction on this subject, that is:

"Whether defendant gave plaintiff reason to believe that its action in taking the payment of $107.11 credited on July 30, 1960 [*sic*] would not be regarded as a breach of contract, and whether defendant by subsequent conduct waived the right to repossess is for you, the jury, to decide."

The court refused this instruction and gave a similar instruction offered by plaintiff. Defendant may not now complain of plaintiff's instruction where a similar instruction was offered by defendant and refused. (4 Cal.Jur.2d § 557, p. 423; *People* v. *Harlan*, 133 Cal. 16, 23 [65 P. 9]; *Jentick* v. *Pacific Gas & Elec. Co.*, 18 Cal.2d 117, 122 [114 P.2d 343].)

Some claim is made by defendant that plaintiff failed to secure and carry insurance on the car. The record indicates that plaintiff was charged with and agreed to pay, as part of the monthly payments on the contract of purchase, a definite amount for insurance charges. Application was made therefore through defendant to process such insurance, with loss payable to defendant. Upon signing the contract, the car was released to plaintiff. Plaintiff assumed he had insurance coverage. At least he was not notified differently. However, there is a notation on defendant's records as of July 24 that someone stated the customer had no insurance coverage because he moved from place to place. The claimed right of repossession in this case was for failure to pay the additional $200 demanded. We see no merit to this claim. It was stated in *Knarston* v. *Manhattan L. Ins. Co.*, 124 Cal. 74, 77 [56 P. 773]:

"The law does not like forfeitures, and evidence tending to show the waiver of a forfeiture will be looked upon with kindly eyes. While the time for payment of premiums is a pure matter of contract between the parties, and such time may not be extended by the courts, still forfeitures will be avoided upon any reasonable showing. The amount of evidence demanded to establish a forfeiture is much greater than is needed to establish a waiver. Again, there need be no direct and specific agreement to waive the forfeiture. A waiver may be implied from the acts and conduct of the parties."

An exhibit shows that the insurance company did issue a policy on June 26 and did not cancel it until August 19, 1958. Another exhibit indicates plaintiff's account was on June 30, 1958, credited for the sum of $36.80 by reason of the cancellation of the policy.

The conclusion reached by the jury that plaintiff had not breached his contract; that Exhibit K was invalid, or, if not, defendant waived strict performance thereunder, has sufficient evidentiary support. (*Ciulla* v. *Telschow*, 152 Cal.App.2d 597 [313 P.2d 188]; *Hoppin* v. *Munsey*, 185 Cal. 678 [198 P. 398]; *Lindsey* v. *Butte, supra*, 96 Cal.App. 465.)

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied October 30, 1961, and appellant's petition for a hearing by the Supreme Court was denied November 29, 1961.